# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

---

DAVID ELIJAH BOWERS, SR.,

                Plaintiff,

       -vs-                        Case No.   01-C-975

ELLIE SEYMOUR, MARY KAY SCHUKNECT,
CHARLES E. FITZGERALD, JR, and JANISE JOHNSON,

                Defendants.

---

## DECISION AND ORDER

---

       This matter is before the court on the defendants' motion for summary judgment.

## STANDARD FOR SUMMARY JUDGMENT

       Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that, under the applicable substantive law, "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over

"material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

The burden of showing the needlessness of trial – (1) the absence of a genuine issue of material facts; and (2) an entitlement to judgment as a matter of law – is upon the movant. However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. *Id.* at 267; *see also Celotex Corp.*, 477 U.S. at 324 ("proper" summary judgment motion may be "opposed by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves . . ."); Fed. R. Civ. P. 56(e)(2) ("When a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleadings; rather its response must - by affidavits or as otherwise provided in this rule - set out specific facts showing a genuine issue for trial"). "Rule 56(c) mandates the entry of summary judgment, . . . upon motion, against a party who fails to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial." *Celotex Corp.*, 477 U.S. at 322.

## BACKGROUND

On September 21, 2001, the plaintiff, David E. Bowers, Sr., a Wisconsin state prisoner, filed this civil rights action under 42 U.S.C. § 1983 along with a petition for leave to proceed *in forma pauperis*. Upon screening the complaint pursuant to 28 U.S.C. § 1915A, the court dismissed the complaint for failure to state a claim upon which relief could be

2

granted. The plaintiff appealed the decision and judgment dismissing his case, and on November 25, 2002, the Seventh Circuit Court of Appeals concluded that the complaint states an Eighth Amendment deliberate indifference to a serious medical need claim, vacated this court's judgment dismissing the complaint, and remanded the case for further proceedings. Counsel was appointed to represent the plaintiff on a *pro bono* fee basis. Over the past few years, the court has extended deadlines several times upon request of the parties, so that discovery could be completed. The defendants filed their motion for summary judgment on July 20, 2009.

In the October 16, 2006 second amended complaint, the plaintiff alleges that he was incarcerated at the Milwaukee County Jail from December 3, 1999 to September 29, 2000. The plaintiff suffers from diabetes and high blood pressure and takes medications for both of these medical conditions. The plaintiff alleges that while incarcerated at the Milwaukee County Jail, the defendants administered Dilantin and Paxil to him, drugs that were supposed to have been administered to inmate David A. Bowers. The plaintiff alleges that he repeatedly alerted the defendants that the Dilantin and Paxil that they were administering to him were supposed to be administered to David A. Bowers. Despite the fact that the plaintiff repeatedly told the defendants that he was not supposed to receive Dilantin and Paxil, they continued to administer these drugs to him for a period of ten months. As a result of ingesting Dilantin and Paxil, the plaintiff alleges that he has developed numerous health problems, including gingival hyperplasia and a heart murmur, that have required

3

medical treatment, including the removal of multiple teeth. He seeks compensatory and punitive damages, costs and disbursements, and such other relief as the court deems just and proper.

**2. Facts**[1]

In August 1999, the plaintiff was taken into custody in Detroit, Michigan and detained in the Wayne County Jail (WCJ) on a warrant issued by Milwaukee County. (DPFF ¶ 404.) Prior to his entry in the WCJ, the plaintiff was seen at the emergency room of Detroit Receiving Hospital. *Id.*

On August 23, 1999, the plaintiff was received into the custody of the WCJ and underwent a jail medical intake screening process in order to determine his medical condition. (DPFF ¶ 405; Defs.' Ex. 1, Bowers' WCJ Medical Records.) According to the plaintiff's WCJ medical records, during the course of the intake process the plaintiff acknowledged that he suffered from a seizure disorder, heart disease, and high blood pressure. *Id.* The medical records also indicate that during the plaintiff's intake screening, he acknowledged taking medications for his several medical problems: glipizide for diabetes, a greenish-white pill for his seizure disorder (later identified as Dilantin), and nitroglycerin for his heart disease; that he had a seizure disorder for forty-two years, used street drugs in the form of crack cocaine for the past five years, drank two forty-ounce beers per day for the

---

[1] This section is taken from Defendants' Proposed Findings of Fact in Support of their Motion for Summary Judgment (DPFF) and from Plaintiff's Additional Proposed Findings in Opposition to Defendants' Motion for Summary Judgment (PAPFF).

last thirty-five years, and smoked one pack of cigarettes per day for the past thirty-four years; and that he had not taken his prescribed seizure medications in the three months prior to his arrest. *Id.*[2]

As a result of the intake screening, WCJ staff diagnosed and treated the plaintiff for diabetes, a seizure disorder, and hypertension, and prescribed medications for each condition including Dilantin for treatment of his seizure disorder. (DPFF ¶ 406, Ex. 1 at 026.) Although the plaintiff sporadically refused dosages of the four medications he was prescribed at the WCJ, he generally accepted Dilantin and had measurable levels of the drug in his body prior to his discharge from the WCJ and extradition to Milwaukee County in December 1999. (*Id.*, Ex. 1 at 029, 030, 050, 052, 060, 061.)[3]

On December 4, 1999, the plaintiff was received into custody at the Milwaukee County Jail (MCJ) at which time he underwent a second medical intake screening to determine his health status. (DPFF ¶ 407; Defs.' Ex. 2, Bowers' MCJ Medical Records, at 0068.) As a result of his intake screening and the information provided by the transferring institution (WCJ), Nurse Retzlaff (not a defendant) continued the plaintiff on the medication he had been receiving in the WCJ. (DPFF ¶ 409, Defs.' Ex. 1 at 0014.) The plaintiff's

---

[2] The plaintiff disputes that he made any such statements to the WCJ intake nurse and he specifically disputes telling the nurse that he had a seizure disorder. (PAPFF ¶¶ 62-68; Bowers dep. p. 78-83.)

[3] According to the plaintiff, if he was on Dilantin during his stay at the WCJ, he was not aware of it. (APFF 32, 72, Bowers dep. p. 52, 85.)

5

medications orders, including a script for Dilantin to treat a seizure disorder, were countersigned by the MCJ physician. *Id.*[4]

Medications in the MCJ are dispensed by a nurse on the pod where an inmate is detained. (DPFF ¶¶ 15-20, 411.) The "med pass" nurse's job is to deliver the prescribed medication to the correct inmate at the correct time. (DPFF ¶¶ 316, 411.) Medications are filled by a pharmacy on blister cards and loaded into the med cart and then the nurse takes the med cart to a pod and delivers to each inmate the dosage contained on the blister card. (DPFF ¶¶ 20-27, 412.)

Inmates may refuse medications at med pass at their own choosing. (DPFF ¶¶ 42, 96-97, 413.) Nurses inform inmates of the medical consequences of refusing medications, but they are free to refuse nonetheless. (DPFF ¶¶ 43, 413.) There is no punishment or discipline for an inmate's exercise of his right to refuse medication. (DPFF ¶¶ 44, 97, 99, 414.) Although a deputy is present at the med pass to preserve order, the deputy does not dispense medication. (DPFF ¶¶ 59-60, 415.) And although no disciplinary action is taken against inmates who refuse medication, disciplinary action is taken against

---

[4] According to the defendants, during the course of his MCJ medical screening by Nurse Retzlaff, the plaintiff self-identified previous diagnoses for diabetes, a seizure disorder, and high blood pressure, and acknowledged that he was taking medication for each of those three medical conditions – in particular, he acknowledged taking Dilantin for his seizure disorder. (DPFF ¶ 408, Defs.' Ex. 2 at 0068.)

According to the plaintiff, he did not tell Nurse Retzlaff that he suffered from a seizure disorder. (PAPFF ¶ 69, 74; Bowers dep. at 84, 87.) Rather, the nurse did not ask a lot of questions, she just asked what kinds of medications he was on and he told her he was on sugar medication and high blood pressure medication and that was all. (PAPFF ¶ 69.) Nursing staff checked everything off on the intake form and told the plaintiff to sign the sheet because they had to get everybody processed, so he simply signed it. (PAPFF ¶ 74.)

6

inmates who harass or interfere with the med pass nurse's ability to carry out her responsibilities of dispensing medications to inmates. (DPFF ¶¶ 53-58, 84, 88-90, 415.)

According to the defendants, although the plaintiff refused sporadically each of his prescribed medications while in the MCJ, he was generally compliant with his medications regimen and had measurable levels of each medication in his body throughout his detention. (DPFF ¶ 410; Defs.' Ex. 2 at 0069-0138.)[5] It is not uncommon for inmates to refuse medications and so the sporadic refusal of medication does not raise a red flag for the med pass nurse. (DPFF ¶¶ 46-49, 99, 416.) It is only when an inmate refuses medication consistently that an explanation is necessary; plaintiff never consistently did so. (DPFF ¶¶ 47, 61-64, 97, 99, 223-27, 310, 417.)[6]

The plaintiff's witnesses confirmed that he sporadically refused medications in the MCJ and, when he did so, was often loud, belligerent, and aggressive, to nursing staff. (DPFF ¶¶ 265-68, 419.). The plaintiff acknowledges that he was often loud to nurses

---

[5] The plaintiff disputes that he only "sporadically" refused medications and was generally compliant. (Def. Ex. 8 at Ex. 8.) The plaintiff asserts that he was forced to take medication through threat of punishment, and was in fact punished when he refused medication and questioned its propriety with the nursing staff. (PAPFF ¶¶ 33, 43, 46, 47, 108, 109, Bowers dep. p. 54, 61, 63-66, 139-40.)

According to the plaintiff, he was put in the hole because he talked back to the sheriff and refused to follow orders from the nurse to take his medication. (PAPFF ¶ 46; Bowers dep. at 63-64.) He refused to take his medication and swallow it in front of them as ordered. Id. This occurred for a period of about seven days in March 2000. Id. In addition, the plaintiff was locked in his cell at least nine times while at the MCJ. (PAPFF ¶ 47; Bowers dep. at 65-66.) He was locked into his cell for talking back to the nurse and the deputy and for refusing the medications. Id. The plaintiff also asserts that he took his medications because he was disciplined. (PAPFF ¶ 108; Bowers dep. at 139.) He was tired of being told what to do and always being told "swallow it, swallow it, take your meds, you got – you need to live, it will help you." Consequently, the plaintiff stayed sedated all the time with very little ability to tell staff no. Id.

[6] The plaintiff disputes that the refusal of medications was sporadic. His refusal of Dilantin on August 31, 2000 began a string of refusing Dilantin eleven times in eighteen days, including three consecutive days on September 2, 3, and 4. Six of those times were refusals from defendant Johnson. (Def. Ex. 8 at Ex. 3, DBSRMC0093, DBSRMC0097.)

7

dispensing medications. (DPFF ¶¶ 154-59, 166-69, 419.) Despite these refusals, however, the plaintiff continued to accept and refuse Dilantin as it was offered to him. (DPFF ¶¶ 149, 150, 178, 419.)

In the only documented instance where the plaintiff told a nurse he believed he was receiving the wrong medication, defendant Nurse Johnson believes that she checked the medication against the plaintiff's medical chart and found that he had identified himself as suffering from a seizure disorder at both the WCJ and MCJ, that he accepted the same treatment protocol and the drug Dilantin at both institutions, and that he accepted Dilantin even after he told the nurse that the medication was not his. (DPFF ¶¶ 61-64, 97, 418.) Specifically, on August 31, 2000, defendant Nurse Johnson recorded that she wrote the following note: "P.M. Nurse Johnson Refused Dilantin. States no seizure history and did not know what medication was for. Though it was for HTN." (Defs.' Ex. 2 at page DBSRMC 0095&0097.) After writing this note Nurse Johnson believes that she went back and checked the plaintiff's "MAR," which showed that he was fairly compliant with his Dilantin prescription. The next step was to check the plaintiff's chart to determine if Dilantin had been prescribed for him, which it was. (DPFF ¶ 61; Janise Johnson dep. at 29.)[7]

Absent emergency circumstances, inmate access to medical and dental care is initiated by inmates through the use of an Inmate Request for Medical/Dental Care form (Request Form or Sick Call Slip). (DPFF ¶¶ 52-55, 88-90, 420.) The plaintiff filed eighteen

---

[7] According to the plaintiff, defendant Johnson does not remember what, if anything, she did with regard to the plaintiff's refusal and there is no indication she performed any investigation whatsoever. (PAPFF ¶¶ 545, 551, 556.)

8

of these forms during his ten-month detention at the MCJ. (DPFF ¶ 420, Defs.' Ex. 2 at 0027-0047.) The procedure for accessing healthcare through the use of the Request Form required an inmate to fill out the Request Form, submit it to the Pod Deputy, the deputy would route the form to the Health Services Unit, which in turn would assign the form to a nurse scheduled to perform "triage" three times daily for a particular pod (DPFF ¶¶ 52-55, 88-90, 420.)

If an inmate was dissatisfied with the treatment of any medical practitioner at the MCJ, there existed a grievance procedure to obtain follow-up care. (DPFF ¶ 423, Defs.' Ex. 2 at 0158-0163.) The inmate grievance form requests that the inmate identify the specific subject matter of the grievance so that it can be routed to the appropriate source such as the Health Services Unit for inmate health issues. (*Id.*, Ex. 2 at 0158.) The plaintiff filed three such complaints, two of which identified inmate health issues. (*Id.*, Ex. 2 at 0161, 0163.) A fourth complaint filed by the plaintiff on an inmate request form and addressed to the "cashier" complained about a mistaken charge the plaintiff received for a dental visit and, incidentally, stated: "I was given the wrong medications for someone else." (*Id.*, Ex. 2 at 0164.) The request did not disclose the mistaken medication or who the "someone else" might have been. There is no evidence that this inmate request ever reached anyone in the HSU. (DPFF ¶ 423.)[8]

---

[8] According to the plaintiff, his inmate request dated August 20, 2000 indicating that he was receiving the wrong medication belonging to someone else was routed to the HSU as evidenced by a note redirecting it to "Nurse/Dentist" and the fact that it was located in the plaintiff's MCJ medical file. (Def. Ex. 8 at Ex. 1; Def. Ex. 14.)

9

Among the freestanding medical professionals in the MCJ, there were nurse practitioners who saw inmates after referrals from triage nurses and in emergency circumstances. (DPFF ¶¶ 100-01, 424.) Although supervised by the MCJ medical director, the nurse practitioner had prescription authority for a wide range of medications. *Id.* Although the plaintiff saw the triage nurse on approximately eighteen occasions (Ex. 2 at 027-047) and visited the MCJ dentist on five occasions (Ex. 2 at 002, 009, 011, 012), he only visited the nurse practitioners four times; twice to defendant NP Seymour (Ex. 2 at 011 and 010) and twice to NP Wittweir (Ex. 2 at 010 and 008). (DPFF 425.)[9]

During his detention at the MCJ, the plaintiff made several requests for dental care from the triage nurses. (DPFF ¶ 426, Ex. 2 at 42-45, 32-37, 27-29, 23.) Based on those requests, nurses provided the plaintiff with triage for dental pain and other complaints and referred him to the dentist for care four times. (*Id.*, Ex. 2 at 011-012, 016-017, 232.) Although the plaintiff refused to attend one dental visit (Ex. 2 at 011-012, 039), he saw the dentist four times during his confinement. (*Id.*, Ex. 2 at 01-12, 016-017, 232.)

When the plaintiff saw the MCJ dentist on March 8, 2000 for a tooth extraction, although she noted that the plaintiff's gums were hyperplastic, the dentist also noted that he "had really poor" oral hygiene and urged him to have his teeth cleaned. (DPFF

---

[9] According to the plaintiff, he would also see defendant NP Seymour on occasions when he was in the HSU for dental care and when she called him down to take Paxil. (PAPFF ¶ 54, Bowers dep. p. 72-73.)

¶ 427, Ex. 2 at 012.)[10]  When the plaintiff returned to the dentist on April 12, 2000 for another extraction, the dentist also trimmed the swollen (hyperplastic) tissue around his teeth. (DPFF ¶ 428, Ex. 2 at 011.)  Approximately one month later the dentist extracted another tooth, and noted the plaintiff's swollen (hyperplastic) gums.  (DPFF ¶ 429, Ex. 2 at 011.) She also noted her suspicion that the condition was "possibly from meds" and poor oral hygiene.  *Id.*[11]  Finally, after a nurse's referral for hyperplasia, the dentist saw the plaintiff and noted severe periodontal disease and gingival hypertrophy; she ordered a Peridex rinse and pain medication, and scheduled the plaintiff for gum surgery and an extraction.  (DPFF ¶ 430, Ex. 2 at 016-017.)  The planned surgery did not occur, however, because the plaintiff was transferred into the custody of the State of Wisconsin Department of Corrections (DOC) system before the scheduled appointment.  (DPFF ¶ 431, Ex. 3 at 232.)

The triage nurses responded to several dental issues raised while the plaintiff was in the MCJ.  On December 13, 1999, the plaintiff complained in an Inmate Request Form about bleeding from his right molar.  (DPFF ¶ 432, Ex. 2 at 045.)  The triage nurse reviewed the request and referred the plaintiff to the MCJ dentist for care of his right molar. *Id.*  On December 25, 1999, the plaintiff complained of pain from the extraction of his right molar; the triage nurse reviewed the request and noted that the plaintiff was already on the

---

[10] According to the plaintiff, despite his regular dental habits, the administration of Dilantin caused his tissue to be so hyperplastic that he could not accomplish effective oral hygiene.  Consequently, no degree of hygiene could have helped him without the tissue first being addressed.  (McNamara dep. p 32-34.)

[11] On May 3, 2000, the dentist confirmed that the plaintiff's medication was contributing to his oral condition. (Pl.  Ex. E at 15; Def. Ex. 2 at DBSRMC0011.)

appointment list for the dentist. (DPFF ¶ 433, Ex. 2 at 043.) On December 29, 1999, the plaintiff complained about three teeth, including the same right molar which appeared to be irritated by the tooth immediately below it; the triage nurse reviewed the request and referred the plaintiff to the dental clinic and to the nurse practitioner for an antibiotic. (DPFF ¶ 434, Ex. 2 at 042.) On January 12, 2000, the MCJ dentist noted that the plaintiff refused to attend a scheduled dental visit. (DPFF ¶ 435, Ex. 2 at 039.) On February 3, 2000, the plaintiff made a request to reschedule the January 12, 2000 dental appointment he had missed (to extract teeth) and was referred a second time by the triage nurse to the dentist. (*Id.*, Ex. 2 at 037.) On February 25, 2000, the plaintiff identified bleeding from two teeth and requested to have them pulled; the triage nurse reviewed the request and scheduled the plaintiff for a dental visit for the extractions. (DPFF ¶ 436, Ex. 2 at 036.) On March 6, 2000, the plaintiff requested the extraction of another tooth (Ex. 2 at 035) and on April 6, 2000, complained that the place where the tooth had been was still bleeding. (DPFF ¶ 437, Ex. 2 at 034.) The triage nurse reviewed the plaintiff's request, administered a pain protocol, and referred the plaintiff to the dentist. *Id.* On April 28, 2000, after an examination of the plaintiff for other issues, the triage nurse noticed that the plaintiff's gums were swollen and bleeding and referred him to the dentist. (DPFF ¶ 438, Ex. 2 at 029.) On May 14, 2000, the plaintiff complained that his gums were swollen and painful. (DPFF ¶ 439, Ex. 2 at 027.) The triage nurse reviewed the complaint and viewed the plaintiff's sore and bleeding gums and observed that the condition was "possibly secondary to Dilantin" and referred the plaintiff

12

to the dentist and the nurse practitioner.  *Id.*  Defendant NP Seymour reviewed the nurse's note and observed that the plaintiff's dental complaints were not acute but were chronic and were currently being addressed by the dentist.  *Id.*

On July 23, 2000, the plaintiff, after a hiatus in his dental complaints of approximately three months, complained about swollen and painful gums.  (DPFF ¶ 440, Ex. 2 at 023.)  The nurse reviewed the complaint, and rather than referring the plaintiff to the dentist <u>and</u> an NP, referred the plaintiff <u>solely</u> to the NP.  *Id.*  NP Seymour reviewed the complaint and the nurse's referral and wrote that the plaintiff "needs a <u>dentist</u>."  *Id.* (emphasis in original).  Thereafter, on August 18, 2000, the plaintiff complained about his gums, the triage nurse referred him to the dentist.  (DPFF ¶ 441, Ex. 2 at 023.)  After failing or refusing to see the dentist for his August 18, 2000 request, the plaintiff asked to see the dentist and another dental appointment was made.  (*Id.*, Ex. 2 at 020.)

In a note dated September 1, 2000, the MCJ dentist ordered the plaintiff a Peridex mouthwash, scheduled the plaintiff for tooth extraction and gum surgery, and noted the plaintiff's severe hypertropy and gingival hyperplasia.  (DPFF ¶ 442, Ex. 2 at 017.) Before these procedures could be performed, the plaintiff was transferred into the custody of the DOC.  (*Id.*, Ex. 3 at 0232.)

On September 29, 2000, the plaintiff was received into the custody of the DOC where Verna Lese, RN, who has conducted thousands of intake medical screenings for the DOC and understands the importance of recording accurately the medical information

13

provided by inmates, performed Bowers' intake medical screening. (DPFF ¶ 448, Ex. 4 at 2.) During the course of his interview with Nurse Lese, the plaintiff informed Nurse Lee that he had a history of a seizure disorder, smoked two packs of cigarettes per day, had high blood pressure, tooth and gum problems, and alcohol abuse ("heavy use!"). (DPFF ¶ 449, Ex. 4; Ex. 3 at 336-351.)[12] As a result of the information provided to Nurse Lese by the plaintiff at his DOC intake medical screening, Nurse Lese was satisfied that the plaintiff suffered from a seizure disorder and, therefore, she continued his prescription for the anti-seizure medication Dilantin. (DPFF ¶ 450, Ex. 4 at 4.) Despite the plaintiff's complaint of "bad teeth" (Ex. 3 at 336) and "severe tooth and gum problems" (Ex. 3 at 338), there is no evidence that the plaintiff's treatment for these maladies differed in any significant way from his treatment for them in the MCJ. (DPFF ¶¶ 360-61, 451.)

In November 2000, the plaintiff was transferred to the DOC institution at Waupun. (DPFF ¶ 452, Ex. 5 at 1.) At that time, Wendy Polenska worked as a registered nurse at Waupun. *Id.* On March 6, 2001, Nurse Polenska responded to the plaintiff's request for medical care and the plaintiff reported that he was having seizures. (DPFF ¶ 453, Ex. 5 at 2.) The plaintiff also reported to Nurse Polenska that his roommate at the prison witnessed him "having a seizure." (DPFF ¶ 454, Ex. 5 at 2.) As a result of the plaintiff's statements,

---

[12] The plaintiff denies being asked about seizures or telling an intake nurse that he abused alcohol. (PAPFF ¶¶ 90-91, Bowers dep. p. 93, 113-14.)

14

Nurse Polenska referred the plaintiff to a medical practitioner at Waupun for follow-up care for a seizure disorder. (DPFF ¶ 455, Ex. 5 at 2.)[13]

In May 2001, Heidi Blair was working as a registered nurse at the Waupun WI DOC prison. (DPFF ¶ 456, Ex. 6 at 1.) On May 8, 2001, Nurse Blair responded to the plaintiff's request for medical care and, during the course of his interview, the plaintiff stated that in the previous two days he had two seizures – one seizure the previous night and another seizure the night before that and that his cellmate had observed both seizures. (*Id.*, Ex. 6 at 2.) Nurse Blair recorded the plaintiff's statement from their interview as follows: "My cellie told me I had a seizure last night and Sunday night too." (DPFF ¶ 457, Ex. 6 at 2.) As a result of this information, Nurse Blair referred the plaintiff to a medical practitioner for follow-up care for a seizure disorder. (DPFF 458, Ex. 6 at 3.)[14]

According to the plaintiff, he was first given Paxil on January 27, 2000, by defendant Seymour. (PAPFF ¶ 23.) The plaintiff testified that defendant Seymour twice called him to the nurse's station to be administered Paxil that may have been meant another inmate with the same name who was prescribed Paxil.

Defendant Charles Fitzgerald died in March 2008. (DPFOF ¶ 230.)

## ANALYSIS

---

[13] The plaintiff disputes that what he reported was a seizure. What people may confuse for seizures may actually be something else. (PAPFF ¶ 596, Rieger dep. p. 66.) Response to these events came in the form of adjusting oral hypoglycemics, indicating that they were not epileptic seizures but rather glycemic events. (PAPFF ¶ 643, Pl. Ex. D, Nievera Report p. 2.) The plaintiff's state and subsequent MCJ medical records all reflect no history of seizures and no Dilantin administration. (PAPFF ¶¶ 647-49.)

[14] See supra. n. 13.

15

The defendants contend that summary judgment should be granted in their favor because there is no genuine issue of material fact that: (1) the plaintiff disclosed his medical history at all three correctional institutions in which he was incarcerated or detained and self-identified that he had been suffering from a seizure disorder; (2) he had been taking Dilantin for more than forty years for treatment of his seizure disorder; (3) the plaintiff was treated for his seizure disorder with substantially the same medical protocol in all three correctional institutions in which he was incarcerated or detained; (4) although the plaintiff mistakenly received Paxil for approximately ten days in the MCJ, the mistake was inadvertent and caused him no harm; (5) there is no evidence that any of the named defendants had the mental state necessary to support an Eighth Amendment claim.

In response, the plaintiff contends that summary judgment is inappropriate because a reasonable view of the disputed facts is that the defendants, (1) were repeatedly told by the plaintiff that he did not have a seizure disorder, a history of seizures, or a medical need for Dilantin or Paxil and believed he was receiving other peoples' medications; (2) were aware of the extreme risks associated with administering incorrect medications generally and Dilantin and Paxil in particular; (3) were aware of a need to act to prevent harm to the plaintiff; and (4) failed to act even though they easily could have done so.

In reply, the defendants contend that because the undisputed facts show that the care offered the plaintiff at all three corrections institutions was either: (1) consistent with

16

plaintiff's known symptoms as they were contained in his medical records, (2) mistaken, or (3) negligent, he may not recover under the Eighth Amendment.

To establish liability under the Eighth Amendment, a prisoner must show: (1) that his medical need was objectively serious; and (2) that the official acted with deliberate indifference to the prisoner's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001); *see also Estelle v. Gamble*, 429 U.S. 97, 104-05 (1976); *Zentmyer v. Kendall County, Ill.*, 220 F.3d 805, 810 (7th Cir. 2000). There is no dispute that the plaintiff's condition qualifies as a "serious medical need" and thus the focus is on deliberate indifference. That inquiry is a subjective one that asks whether "the prison official acted with a sufficiently culpable state of mind." *Norfleet v. Webster*, 439 F.3d 392, 395 (7th Cir. 2006) (quoting *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002)).

A prison official acts with deliberate indifference when "the official knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Norfleet*, 439 F.3d at 396; *Chapman v. Keltner*, 241 F.3d 842, 845 (7th Cir. 2001) (a finding of deliberate indifference requires evidence "that the official was aware of the risk and consciously disregarded it nonetheless") . Negligence does not meet this standard and "even admitted medical malpractice does not give rise to a constitutional violation. *Norfleet*, 439 F.3d at 396 (quoting *Walker*, 293 F.3d at 1037); *see also Estelle*, 429 U.S. at 106. A difference of opinion among medical professionals on how an inmate should be treated

17

cannot support a finding of deliberate indifference. *Norfleet*, 439 F.3d at 396 (citing *Garvin v. Armstrong*, 236 F.3d 896, 898 (7th Cir. 2001)). "For a medical professional to be liable for deliberate indifference to an inmate's medical needs, he must make a decision that represents such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment." *Jackson v. Kotter*, 541 F.3d 688, 697 (7th Cir. 2008) (citing *Sain v. Wood*, 512 F.3d 886, 895 (7th Cir. 2008) (internal quotations omitted)).

As an initial matter, defendant Charles Fitzgerald died in March 2008. The plaintiff had notice of his death and did not file a motion for substitution as described in Federal Rule of Civil Procedure 25(a). Accordingly, defendant Fitzgerald will be dismissed.

It is undisputed that following the plaintiff's intake medical screening at MCJ, Nurse Resnick diagnosed him with a seizure disorder and prescribed Dilantin, among other things. It is also undisputed that the plaintiff was diagnosed with a seizure disorder and prescribed Dilantin at his previous institution, WCJ, and at his subsequent DOC institution (although this diagnosis was later changed). The plaintiff claims that, although he has experienced "sugar black-outs" related to his diabetes, he has never had a seizure let alone a seizure disorder and that he never told the intake screening nurse at WCJ, MCJ, or the DOC that he had a seizure disorder. However, the plaintiff does not claim that any defendant had involvement in making the alleged incorrect diagnoses. The undisputed facts reveal that there is one documented time that one of the defendants was informed by the plaintiff that

18

he was not supposed to be taking Dilantin.  Although defendant Nurse Johnson does not specifically recall this incident, she testified that when faced with a situation where an inmate reports that he received the wrong medication, her practice is to check his chart and that she would have done that in this case.  Upon checking the plaintiff's chart she would have seen that he had been prescribed Dilantin for a seizure disorder and that he was also taking the medication for the same purpose at his previous institution.

The plaintiff also claims that his inmate request dated August 20, 2000 indicating that he was receiving the wrong medication belonging to someone else was routed to the HSU as evidenced by a note redirecting it to "Nurse/Dentist" and the fact that it was located in the plaintiff's MCJ medical file.  (Def. Ex. 8 at Ex. 1; Def. Ex. 14.)  However, there is no evidence that any defendant, or any individual in the Health Services Unit for that matter, ever received this request.  The focus of the request is a complaint to the MCJ cashier regarding a charge for medical services that the plaintiff thought he should not be receiving.

It is undisputed that inmates at the MCJ are free to refuse their medication and that the plaintiff refused his medication various times.  The med pass nurse told the plaintiff that he should take his prescribed medication and that his health would be at risk if he did not take it but he was still free to refuse it.  Although the plaintiff testified that he did not feel free to refuse his medication because he would be locked in his cell or put in the "hole," his medical chart reveals that he did refuse it.  Also, the plaintiff does not dispute that he took other actions such as being disrespectful or argumentative that were the cause of his

19

placement in his cell or the hole. The plaintiff goes on to argue that he was too scared to refuse his medication because he would be punished but at the same time contends that the defendants should have been alerted to the fact that Dilantin was not the correct medication for him because of how often he refused it.

It is undisputed that the plaintiff suffered serious dental issues resulting in having to have his teeth pulled while at the MCJ. He attributes this to the Dilantin that was allegedly wrongly prescribed to him in the MCJ. However, the plaintiff first filed an inmate request complaining of a bleeding molar on December 13, 1999, ten days after arriving at the MCJ. Following a missed January 2000 appointment with the dentist, the plaintiff first saw the dentist for an extraction on March 8, 2000 and the dentist noted that the plaintiff's gums were hyperplastic and also that the plaintiff "had really poor" hygiene. The dentist performed another extraction on April 12, 2000. About a month later, the dentist extracted another tooth, noted the plaintiff's swollen (hyperplastic) gums, and her suspicion that the condition was "possibly from meds" and poor oral hygiene. Later, after a nurse's referral for hyperplasia, the dentist saw the plaintiff for severe periodontal disease and gingival hypertrophy. The dentist also ordered a Peridex rinse and pain medication, and also scheduled the plaintiff for gum surgery and an extraction. The plaintiff was transferred to the DOC before the surgery.

The plaintiff claims that defendant Seymour should have taken the plaintiff off of his Dilantin medication and that her failure to do so was deliberate indifference. However,

20

defendant Seymour referred the plaintiff to the dentist instead. While it may have been negligent for Seymour to not conduct additional testing on the plaintiff after he reported that he did not have a seizure disorder and his mouth was in bad shape, Seymour did refer him to the dentist based on his complaints about mouth and teeth. Given that the plaintiff had been diagnosed with a seizure disorder at the MCJ and at his previous institution, Seymour's decision to not remove him from his seizure medication and instead refer him to another medical professional was not blatantly inappropriate. *See Johnson v. Doughty*, 433 F.3d 1001, 1013 (7th Cir. 2006) (a medical professional's erroneous treatment decision can lead to deliberate indifference liability only if the decision was made in the absence of professional judgment). The plaintiff has not presented evidence that defendant Seymour's treatment decision was "so far afield of accepted professional standards as to raise the inference that it was not actually based on a medical judgment." *Duckworth v. Ahmad*, 532 F.3d 675, 680 (7th Cir. 2008) (quoting *Norfleet*, 439 F.3d at 396).

The plaintiff alleges that he mistakenly received Paxil that had been prescribed for another inmate with the same name. He alleges that defendant Seymour twice gave him this medication. There is nothing in the record showing that this was anything more than a mistake or that the plaintiff was harmed by this.

The undisputed facts do not support a finding that any defendant was deliberately indifferent to the plaintiff's serious medical need.

21

**ORDER**

**IT IS THEREFORE ORDERED** that the defendants' motion for summary judgment (Docket #61) is **granted**.

**IT IS FURTHER ORDERED** that the Clerk of Court enter judgment dismissing the plaintiff's claims and this action.

Dated at Milwaukee, Wisconsin, this 22nd day of December, 2009.

**SO ORDERED,**

*s/ Rudolph T. Randa*

_____

**HON. RUDOLPH T. RANDA**
**Chief Judge**

22